AO 91 (REV.5/85) Criminal Complaint

AUSA Joseph H. Thompson (312) 469-6131
AUSA Anthony P. Garcia (312) 886-1000

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**
8-22-2011
AUG 2 2 2011
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JAMES GRACE,
    also known as "Mega";
JOSEPH KRUZEL;
SERGIO TOUTGES,
    also known as "Little Rat";
JENNIFER MILLHORN; and
BOBBY PRICE,
    also known as "Bear"

**CRIMINAL COMPLAINT**

CASE NUMBER: **11CR 558**

**UNDER SEAL**

**MAGISTRATE JUDGE VALDEZ**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

### Count One

On or about January 12, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JAMES GRACE, also known as "Mega," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm, namely, an Amadeo Rossi .38 caliber handgun, bearing serial number 157156, which firearm was in or affecting interstate commerce in that the firearm had traveled interstate prior to the defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g)(1).

### Count Two

On or about January 15, 2011, at Villa Park, in the Northern District of Illinois, Eastern Division, SERGIO TOUTGES, also known as "Little Rat," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm, namely, a .38 caliber Smith and Wesson revolver, bearing serial number J906578, which firearm was in or affecting interstate commerce in that the firearm had traveled interstate prior to defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g)(1).

## Count Three

On or about February 20, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JENNIFER MILLHORN, JAMES GRACE, also known as "Mega," and JOSEPH KRUZEL did knowingly sell in and affecting interstate commerce a firearm, namely, a .38 caliber Smith and Wesson revolver, bearing serial number J906578, which firearm had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2.

## Count Four

On or about June 11, 2011, at Elmhurst, in the Northern District of Illinois, Eastern Division, BOBBY PRICE, also known as "Bear," and JOSEPH KRUZEL did knowingly sell in and affecting interstate commerce a firearm, namely, a Smith and Wesson, .40 caliber handgun, Model SW40V, bearing serial number #PAW8935, which firearm had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2.

## Count Five

On or about June 27, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JOSEPH KRUZEL did knowingly sell in and affecting interstate commerce ammunition, namely, forty-one .22 caliber long round ammunition and .22 caliber short rounds, which ammunition had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2.

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
LARISSA K. BACCUS
Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to before me and subscribed in my presence,

August 22, 2011 _____ at Chicago, Illinois _____
Date                                                           City and State

Maria Valdez, U.S. Magistrate Judge _____ _____
Name & Title of Judicial Officer                 Signature of Judicial Officer

3

STATE OF ILLINOIS  )
         )  ss
COUNTY OF COOK  )

## AFFIDAVIT

I, Larissa K. Baccus, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since approximately 2007. I am currently assigned to Chicago Field Division, Downers Grove Field Office in Downers Grove, Illinois, and my responsibilities include the investigation of federal firearms offenses and drug trafficking committed by members of street gangs and other organizations whose members engage in violent criminal activity.

2. The information in this Affidavit is drawn from interviews of a confidential informant, consensually recorded conversations, controlled purchases of firearms and ammunition, physical surveillance, information received from other law enforcement agents, state and local police reports, and National Criminal Information Center ("NCIC") records, my experience and training, and the experience of other agents.

3. My understanding and interpretation of recorded conversations set forth in this affidavit are based on my knowledge of the investigation to date and review of consensually recorded conversations, the content and context of the

conversations, prior and subsequent conversation, information provided by a confidential informant, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. The summaries of conversations do not include all potentially criminal conversations recorded during this investigation, or all statements or topics covered during the course of the recorded conversations. The quoted material contained in the Affidavit are based on summaries of the recorded conversation, not final transcripts, and the times listed for these conversations are approximate.

4.     This Affidavit is made for the limited purpose of establishing probable cause for the issuance of a criminal complaint charging:

a.     On or about January 12, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JAMES GRACE, also known as ("aka") "Mega," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm, namely, an Amadeo Rossi .38 caliber handgun, bearing serial number 157156, which firearm was in or affecting interstate commerce in that the firearm had traveled interstate prior to the defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count One);

2

b.    On or about January 15, 2011, at Villa Park, in the Northern District of Illinois, Eastern Division, SERGIO TOUTGES, aka "Little Rat," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm, namely, a .38 caliber Smith and Wesson revolver, bearing serial number J906578, which firearm was in or affecting interstate commerce in that the firearm had traveled interstate prior to defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Two);

c.    On or about February 20, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JENNIFER MILLHORN, JAMES GRACE, aka "Mega," and JOSEPH KRUZEL did knowingly sell in and affecting interstate commerce a firearm, namely, a .38 caliber Smith and Wesson revolver, bearing serial number J906578, which firearm had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2 (Count Three);

3

d.   On or about June 11, 2011, at Elmhurst, in the Northern District of
Illinois, Eastern Division, BOBBY PRICE, aka "Bear," and JOSEPH
KRUZEL, did knowingly sell in and affecting interstate commerce
a firearm, namely, a Smith and Wesson, .40 caliber handgun, Model
SW40V, bearing serial number #PAW8935, which firearm had
traveled interstate commerce, to a person knowing or having
reasonable cause to believe that such person had been convicted of
a crime punishable by imprisonment for a term of imprisonment
exceeding one year, in violation of Title 18, United States Code,
Sections 922(d)(1) and 2 (Count Four); and

e.   On or about June 27, 2011, at Lombard, in the Northern District of
Illinois, Eastern Division, JOSEPH KRUZEL, did knowingly sell in
and affecting interstate commerce ammunition, namely, forty-one
.22 caliber long round ammunition and .22 caliber short rounds,
which ammunition had traveled interstate commerce, to a person
knowing or having reasonable cause to believe that such person had
been convicted of a crime punishable by imprisonment for a term of
imprisonment exceeding one year, in violation of Title 18, United
States Code, Sections 922(d)(1) and 2 (Count Five).

4

5.     Because this affidavit is being submitted for the limited establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are sufficient to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

### Overview and Historical Informant Provided by the CI

6.     Since approximately December 2009, ATF has been investigating illegal firearm sales and trafficking by JAMES GRACE, also known as "Mega" ("GRACE"), and other members of the Almighty Gaylord Nation, a Chicago-based street gang (the "Gaylords"). A confidential informant (the "CI") has provided information to law enforcement regarding GRACE and other members of the Gaylords street gang.[1]

-----

[1]     The CI began cooperating with ATF in exchange for monetary compensation in approximately January 2009. The CI's cooperation has continued to the present. During that time, the CI has received over $30,000 in payments from ATF in connection with his participation in various investigations. The CI has a history of substance abuse. The CI has multiple state felony convictions, including a conviction for possession of a controlled substance for which defendant was sentenced to one year imprisonment while he was cooperating with ATF. Once the CI completed the sentence, s/he resumed cooperation with ATF.

The CI has provided timely and reliable information concerning the illegal activities of GRACE and other Gaylords as detailed below. A substantial portion of the CI's information has been corroborated by independent investigation, including physical surveillance, controlled firearms and ammunition purchases, and consensually–recorded telephone calls and conversations.

On April 11, 2011, the CI engaged in the controlled purchase of a .22 caliber rifle

7.     During the investigation, the CI purchased firearms and ammunition from members of the Gaylords.  As described below, GRACE facilitated firearms transactions, some of which involved Gaylord "nation" guns that were held by various Gaylords on behalf of the gang.

8.     The CI advised law enforcement that s/he became a member of the Sayre Park (Chicago) Gaylords[2] in approximately 1991.  The CI later became a member of the Addison, Illinois faction of the Gaylords while cooperating with ATF.  Based on the CI's personal observations and the CI's conversations with members of the Gaylords, the CI provided the following information to law enforcement:

---

from Christopher BATTAGLIA, who is charged in a separate criminal complaint. After the controlled buy the CI gave the .22 caliber rifle and an video/audio recoding device to ATF agents.  During the debrief of the controlled buy, agents asked the CI if he participated in any illegal activity during the controlled buy.  The CI admitted that s/he smoked a marijuana cigarette while waiting for BATTAGLIA to arrive to BATTAGLIA's house.  ATF agents reviewed the audio/video recording from the purchase and believed that the recording showed that CI smoke a marijuana cigarette while he was waiting to buy the rifle from BATTAGLIA.  Agents confronted CI, who again admitted to secreting the marijuana in the crotch area of his body and smoking the marijuana cigarette while waiting for BATTAGLIA.  Agents admonished the CI of his actions.

During the CI's cooperation, the CI was also arrested twice for disorderly conduct.  One of these prosecutions was dismissed and one case is still pending.  The ATF did not intervene in either prosecution.

---

[2]     According to the CI, Gaylords is an acronym standing for "Great American Youth Leading Our Race Destroying Spics."

a.     **GRACE:** The CI knows GRACE to be the leader of the Addison,
Illinois-faction of the Gaylords.[3]   According to NCIC records,
GRACE is a reputed member of the Gaylords street gang with
multiple prior felony convictions, including a 2006 conviction in
DuPage County for felon in possession of a firearm for which
GRACE was sentenced to six years' imprisonment in the Illinois
Department of Corrections ("IDOC").  According to IDOC records,
GRACE was on parole following this conviction until July 20, 2011.
The CI knows GRACE to possess and store guns beloning to the
Gaylords gang (Gaylord "Nation" guns) and to distribute guns to
various members of the Gaylords.  As described below, GRACE
knowingly possessed a firearm and participated in the sale of
multiple firearms to the CI.

b.     **JOSEPH KRUZEL ("KRUZEL"):** The CI knows KRUZEL to be a
member of the Gaylords.  According to NCIC records, KRUZEL has
no felony convictions and has a valid Firearms Owner Identification
("FOID") card.  The CI knows KRUZEL to use his valid FOID to buy
firearms and ammunition for members of the Gaylord Nation.

---

[3]     During recorded conversations with the CI at various points throughout
the investigation, GRACE and other Gaylords identified GRACE as the leader
of the Addison Gaylords.

KRUZEL also allows GRACE and other Gaylords to hide Gaylord "Nation" guns that belong to the Gaylord gang at his home. The CI also knows KRUZEL to use his FOID card to transport firearms to and from Gaylords, including Gaylords who are convicted felons. As described below, during the investigation, KRUZEL participated in multiple firearms and ammunition sales to the CI.

c. **SERGIO TOUTGES, aka "Little Rat" ("TOUTGES"):** the CI knows TOUTGES to be a member of the Addison Gaylords. The CI has known TOUTGES for approximately 15 years, and previously served time in IDOC with TOUTGES. According to NCIC records, TOUTGES has multiple felony convictions, including a May 2006 conviction for unlawful possession of a firearm by a convicted felon, for which TOUTGES was sentenced to 6 year's imprisonment in IDOC. As described below, TOUTGES knowingly possessed a firearm and participated in the sale of a firearm to the CI.

d. **JENNIFER MILLHORN:** The CI knows MILLHORN to be a member of the Gaylords, and to reside with TOUTGES. According to the CI, s/he has visited MILLHORN and TOUTGES's apartment with them present. As described below, MILLHORN sold the CI a

8

firearm in order to raise money to bond TOUTGES out of jail following TOUTGES's arrest on state charges.

e.    **BOBBY PRICE, aka "Bear" ("PRICE"):** The CI knows PRICE to be a member of the Gaylords. As further described below, PRICE sold the CI a firearm despite knowing of the CI's status as a convicted felon.

**January 4, 2011: GRACE Agreed to Sell the CI a Handgun**

9.    On or about January 4, 2011, the CI met GRACE to have dinner at a restaurant in Addison, Illinois. Before the meeting, ATF agents equipped the CI with audio and video recording equipment. As reflected in the audio/video recording, the CI subsequently picked up GRACE[4] and drove to the restaurant.

10.    As reflected in the audio/video recording, while en route to the restaurant:

a.    The CI told GRACE that TOUTGES had agreed to sell the CI a gun, but later failed to follow through on the sale.[5] The CI stated, "I was

---

[4]    The identification of GRACE and GRACE's voice in this Affidavit is based upon the following: An undercover ATF agent has met and spoken with GRACE on multiple occasions. Based on his interactions with GRACE, the agent is able to identify GRACE and his video on the audio and video recordings. In addition, agents have positively identified GRACE from audio/video recordings based on an IDOC photograph of GRACE. The CI has also identified an IDOC photograph of GRACE.

[5]    During recorded telephone calls on June 23 and 24, 2010, TOUTGES agreed to sell the CI a .38 caliber handgun for $400. TOUTGES agreed to meet the CI at a McDonald's restaurant in Mount Prospect, Illinois on June 24, 2010 to conduct the

down in Pinckney [IDOC facility] with the fellow [TOUTGES] for six months and he had this and that [firearm] for me when he got out, and twice, he . . . said he had a few nice ones [firearms] for me. When I got out, he gave me a line and a script [TOUTGES led the CI on], I don't know, you could have just told me he don't have it."

b.      GRACE responded, "you did grab one from us, didn't you, a nice one, a big one." The CI understood GRACE to be referring to an AK-47 assault rifle that the CI had previously brought from other Gaylord gang members at ATF's direction.[6]  The CI responded, "oh, you heard about that?"  GRACE stated, "yeah, I know all about it, it's coming from my neighborhood [within the Gaylords]." GRACE told the CI, "I might be able to come up with a little one for you, [smaller caliber handgun] if you want one." The CI responded, "I'm always looking for a little one."  GRACE later told the CI, "I'll be off this fucking ankle bracelet next month."[7]

---

transaction.  TOUTGES later failed to appear at the designated time and place, and the transaction was never completed.

[6]      On December 15, 2010, the CI purchased an AK-47 assault rifle from Edward Rand and Daniel Springhorn at the direction of ATF agents.  Rand and Springhorn are charged with this conduct in a separate criminal complaint.

[7]      At the time, GRACE was on electronic monitoring as part of his parole.

11. As reflected in the audio/video recording, after arriving at the restaurant:

a. The CI again complained to GRACE about TOUTGES's failure to follow through on a planned gun sale. GRACE told the CI, "I could probably get you something. Let me take a look around, see what they got. Because I know we [Gaylords] got a few but, uh, we really don't wanna get rid of 'em, you know. We got the handguns, you know. I mean, that's what you want, a handgun, right?" The CI stated, "yeah." GRACE explained, "the other ones come a dime a dozen, the big ones like the rifles and shit like that. You know I got a rifle I could probably get you." The CI responded, "I'll take them too if you got the extended mags."

b. GRACE replied, "Okay. Let me see what I got. Let me look through the inventory. I got a new .25 [caliber handgun]. I ain't getting rid of that cause I ain't shot that yet. We got a .22 [caliber] rifle. Kinda like that one though . . . We lost one of them, parole took it when they came up and popped me. I had two of 'em."[8] The CI responded,

---

[8] According to CPD reports, on June 17, 2010, police officers conducted a consensual search of an apartment located on S. Broadway in Lombard, Illinois (the "KRUZEL residence"). At the time, GRACE and KRUZEL were living at the apartment. During the search, officers found a bolt action rifle. Following the search, GRACE's parole was revoked and he was reimprisoned. According to IDOC records, on August 9, 2010, GRACE was released on electronic monitoring for the remainder

"you guys didn't get that back? I thought that it was legit?" GRACE stated, "No, he [KRUZEL] had a gun card, but it [the gun] wasn't registered. And, uh, they're . . . trying to say it was stolen."

c.    Shortly before they left the restaurant, GRACE asked the CI, "you want me to look into some things for you?" The CI understood GRACE to be referring to firearms. The CI responded, "yeah." GRACE asked, "anything in particular?" The CI stated, "just not, uh . . . common sense, you know what I mean?" GRACE asked, "what kind of price range you looking at?" The CI stated, "nothing over a G [$1,000]." GRACE stated, "I got a couple of them [guns] for that." GRACE also stated, "Some people [gun dealers] are a little expensive, like, if you were someone they knew, but wasn't a Gaylord, then, yeah, it's gonna be expensive, but it won't be expensive. Revolver, automatic, what?" The CI stated, "revolvers, preferably." GRACE stated, "Okay. I personally like the .357 revolvers. That's my favorite." The CI stated, "I don't know. I'm a .38 [caliber] guy, for some reason."

d.    GRACE later asked the CI, "now these [guns], are they for your guys or is it personal?" The CI responded, "me, personal." GRACE

---

of his parole term.

12

asked, "so you want like just one nice one [gun]?" The CI stated, "yeah, well shit, if you can get me three nice ones, you know, I'll take care of you." GRACE stated, "it's just really many as you want and whatever you want. All you gotta do is tell me what you want and I can get it for you and get it for your price."

e.      GRACE told the CI, "I'm starting to get a nice collection of derringers." When the CI asked, "what caliber?," GRACE replied, "straight up .22. I have a .22 long. I got a 9mm and then I got one that shoots a .410 and a .44." The CI stated, "Wait. You have a derringer that shoots two different calibers?" GRACE responded, "yes." The CI asked if GRACE would be willing to sell the derringer. GRACE responded, "nah, I like that one too much."

f.      GRACE then asked if the CI "still want[ed] me to search around for you [for firearms]?" The CI stated that he did. GRACE stated, "I'll search around for you, but if worse comes to worse, I'll just call fucking, uh, SG [Daniel Springhorn] and Pee Wee [Edward Rand], see what they say, you know, because I know they got whatever we need and all we got to do is tell 'em what we want." As reflected in the audio/video recording, the CI responded, "just give me the price, and hey, I'm here." GRACE asked, "it's for a revolver, man? .38

13

[caliber], I know you bought that. That ain't no grand, you know .

. . that's fucking two, two-fifty at most." The CI responded, "right."

## January 11, 2011:  GRACE Sold the CI a .38 Caliber Handgun (Count One)

12.    On January 9, 2011, at approximately 1:30 p.m., the CI attended a Gaylord party at a house located at Villa Avenue and Beach Street in Villa Park, Illinois (the "Beach Street residence").  Due to concerns that the CI would be searched by members of the Gaylord street gang, the CI did not wear an audio/video recording device to the party. According to the CI, during the party, the CI observed GRACE enter a bedroom along with TOUTGES and Edward Rand.  The CI subsequently went into the bedroom and saw a variety of handguns spread out on a bed, including several .25 caliber handguns and a .38 caliber revolver.  During the ensuing conversation, GRACE explained that he would sell the .38 caliber revolver to the CI for $150, and that the CI could take the gun now and pay GRACE for the gun later.  In response, the CI offered to wait to receive the gun until the CI had the money to pay for it.  The CI told GRACE that the CI would have the money to buy the gun on January 12, 2011.

13.    On or about January 12, 2011, the CI met GRACE to purchase a .38 caliber handgun.  Before the meeting, the CI met with ATF agents.  At approximately 9:41 a.m., ATF agents searched the CI for contraband with

14

negative results. Agents equipped the CI with audio and video recording equipment. Agents also provided the CI with $150 in government funds for use in purchasing a handgun from GRACE.

14.     At approximately 9:48 a.m., while inside an undercover ATF vehicle, the CI placed a telephone call to GRACE at the direction of ATF agents. Only the CI's portion of the telephone call was recorded. During the call, the CI told GRACE that he would be there in about 5 minutes.

15.     At approximately 9:52 a.m., the CI left the staging area en route to GRACE's residence in on S. Adeline Avenue in Addison, Illinois (the "GRACE Residence").[9] Law enforcement agents and officers conducting surveillance (hereinafter "surveillance") observed the CI drive to and enter the GRACE residence.

16.     Shortly thereafter, agents observed the CI and GRACE leave the GRACE Residence, enter the undercover car, and leave the area. As reflected in the audio/video recording, GRACE told the CI that they were going to "Joe's," which the CI understood to mean the KRUZEL residence. Surveillance agents subsequently followed the CI's car to the KRUZEL residence.

17.     At approximately 10:11 a.m., surveillance observed the CI and GRACE enter the KRUZEL residence:

_____

[9]     Illinois driver license records reflect that GRACE lives at the GRACE residence.

15

a.    As reflected in the audio/video recording, GRACE and the CI entered the residence and asked an unidentified man if KRUZEL was home. The man indicated that he was not. GRACE and the CI then went into a bedroom. According to the CI, GRACE then opened a dresser drawer and took out a small Raven Arms .25 caliber handgun. As reflected in the audio/video recording, the CI asked GRACE, "is that the .25 [that GRACE showed the CI on January 9] (see paragraph 12 above)?" According to the CI, GRACE then put the .25 caliber handgun back in and shut the drawer.

b.    According to the CI, GRACE then opened a second dresser drawer and took out the .38 caliber revolver[10] that GRACE had agreed to sell the CI on January 9, 2011. As reflected in the audio/video recording, the CI then counted out the money and handed GRACE $150 in ATF funds. GRACE then counted out the money in increments, and separated the money into specific amounts: "Let me see here. Organize this. Twenty-five. Twenty goes to Bear [PRICE] for [gang] dues, so that's seventy-five. Twenty goes for Pee Wee [Edward Rand] for [gang] dues. The rest . . ." The CI then

---

[10]    Because of the positioning of the video recorder, neither the .25 caliber nor the .38 caliber gun is captured on the video recording.

explained that he was buying the gun for himself, not for the Sayre Park faction of the Gaylords: "This is me. This, this is not Sayre, you know what I mean? This is between me and you." GRACE responded, "okay, alright.";

c. As reflected in the audio/video recording device, GRACE and the CI then returned to the living room and spoke with the old man. During the conversation, GRACE told the old man, "when Joe [KRUZEL] comes home, tell him I put $130 in his top drawer.";

d. As reflected in the audio/video recording, before leaving, the CI pulled GRACE aside and asked, "would you be interested in selling that .25 [caliber handgun]? It's not like you ain't got enough to go around. You got like four, five, six of them motherfuckers." GRACE said that he did not want to sell the gun. GRACE explained, "we [Gaylords] got a large crowd out here and we need 'em, some over here, some over here, some over here . . ." The CI stated, "I just thought I'd ask you. I seen you had enough to go around." GRACE laughed and stated, "Yeah, I like those, I'm keeping those." As reflected in the audio/video, the CI then left the KRUZEL residence.

18. At approximately 10:33 a.m., agents observed the CI leave the KRUZEL residence. Agents followed the CI to a predetermined location. The

17

CI then handed agents an Amadeo Rossi .38 caliber handgun, bearing serial number 157156. Agents then retrieved the audio and video recording devices from the CI and searched the CI for contraband, with negative results.

19. On July 28, 2011, an ATF agent concluded that the Amadeo Rossi .38 caliber handgun, bearing serial number 157156, was not manufactured within the state of Illinois.

## January 15: CI Offered to Buy TOUTGES's .38 Caliber Revolver (Count Two)

20. On or about January 15, 2011, at approximately 12:00 p.m., the CI notified ATF agents that s/he would be attending a Gaylord meeting at 1:00 p.m. that afternoon at the Beach Street residence. ATF agents met the CI in Addison, Illinois, before the Gaylord meeting. ATF agents searched the CI for any contraband and did not find any. ATF agents gave the CI an audio recorder to record the conversations at the Gaylord meeting. ATF agents turned on the recording device and allowed the CI to drive an ATF undercover car to the meeting at the Beach Street residence. ATF agents followed the CI to the residence. According to the CI, TOUTGES and MILLHORN lived in the

basement of the Beach Street residence, while the Gaylord meeting took place on the first floor of the residence.[11]

21.    As reflected in the audio recording, during the meeting:

a.    The CI met with TOUTGES[12] and MILLHORN[13] in their basement apartment. The CI asked TOUTGES and MILLHORN about the J Frame .38 caliber revolver. TOUTGES stated, "it's not going anywhere." MILLHORN stated, "if you were in [an IDOC facility]

---

[11]    According to Addison Police records, on February 16, 2011, Addison police officers and other law enforcement agents executed a search on the Beach Street residence. Following the search, the primary owner of the residence told police that TOUTGES rented out the basement of the Beach Street residence.

[12]    The identification of TOUTGES and TOUTGES's voice in this Affidavit is based on the following: First, according to the CI, he/she has known Sergio TOUGES for approximately 15 years. According to the IDOC records, the CI and TOUTGES were incarcerated in the same IDOC facility for approximately 30 days in April and May 2010. Second, on or about June 23, 2010, ATF agents showed the CI a photograph of TOUTGES and the CI identified the person depicted in the photograph as TOUTGES. Third, on or about July 14, 2011, the CI met with TOUTGES and the meeting was audio and video recorded. An ATF agent positively identified TOUTGES from the audio/video recording based on the photograph the CI identified. Fourth, based on the agents review of the audio/video recordings from the July 14, 2011 meeting, that agent was able to identify TOUTGES's voice.

[13]    The identification of MILLHORN and MILLHORN's voice in this affidavit is based on the following: First, on or about February 4, 2011, the CI reviewed an Illinois Secretary of State Driver's license photograph and identified a photograph depicting MILLHORN. Second, on or about July 14, 2011, the CI met with MILLHORN and the meeting was audio and video recorded. Third, an ATF agent positively identified MILLHORN from the audio/video recording based on the photograph from February 4, 2011, which the CI previously identified. Fourth, based on the ATF agent's review of the audio/video recording from the February 20, 2011 meeting, that agent was able to identify MILLHORN's voice.

when he [TOUTGES] was we could've talked because it [the .38 caliber revolver] woulda been sold for bond money, but he's already out so there's no talkin' no more. No more talkin' [TOUTGES did not want to sell the revolver]." TOUTGES stated that Individual C, who is a fellow Gaylord, had the gun and that Individual C had ruined the revolver.

b.  As reflected in the audio recording, TOUTGES told the CI that he had a "speed loader" for the J Frame .38 caliber revolver. TOUTGES explained that the "special gun" was a Smith & Wesson, and not an Air Weight. According to the CI, TOUTGES had the .38 caliber revolver with him.[14]  The CI later told ATF agents stated that he/she could see the ridges on the hammer of the revolver. TOUTGES told the CI that the revolver was stolen from a cop and that it was a cop's gun. TOUTGES told the CI that the gun was for "my [TOUTGES's] own protection" and that he had "3 hollow point [bullets]." TOUTGES stated, "I can't wait to unload [shoot] on a nigger with it." During the conversation, TOUTGES spun the cylinder of the gun and stated that he had "5 dumb dumbs and 2 more [bullets] on the side."

---

[14]  The CI only had an audio recording device during this meeting.

22.     After the meeting, the CI drove back to Addison, Illinois, and met with ATF agents who retrieved the recording device and the ATF undercover car.

## February 15: TOUTGES and CI Discuss a Possible Gun Transaction

23.     On or about February 12, 2011, the CI again offered to buy the .38 caliber revolver from TOUTGES. That day, the CI contacted ATF agents and told them that GRACE planned to pick-up the CI and take the CI to a Gaylord meeting/party at the KRUZEL residence.

24.     At approximately 1:00 p.m., ATF agents met with the CI outside of the CI's apartment and searched the CI for contraband, with negative results. An ATF agent then gave the CI an audio recording device and told the CI how to turn the recording device on and off. Agents instructed the CI to turn the recording device on prior to the meeting and turn the recording device off after the Gaylord meeting. The CI returned to his apartment and waited for GRACE to arrive.

25.     At approximately 2:25 p.m., surveillance saw a dark Buick arrive to the CI's location. Surveillance saw GRACE and Individual F[15] in the car.

_____

[15]     The CI identified an Illinois Secretary of State driver's license photograph of Individual F. The CI has conducted recorded in-person conversations with Individual F and identified the voice as that of Individual F. According to Lexisnexis Accurint records, Individual F lives at the Beach Street residence.

Agents saw the CI get into the rear passenger side of the car and the car drove away. Agents did not continue surveillance on the car.

26. On or about February 13, 2011, ATF agents met with the CI to discuss the Gaylord meeting that the CI attended on February 12, 2011. Agents retrieved the audio recording of the meeting from the CI. According to the CI, s/he turned on the recording device when GRACE and Individual F picked him up on February 12, 2011. The CI told ATF agents that they then left the CI's apartment, stopped briefly at Individual D's residence, and later drove to the KRUZEL residence.

27. According to the CI, while at the KRUZEL residence, the CI spoke with TOUTGES and MILLHORN. As reflected in the audio recording, during the conversation:

a. The CI asked what TOUTGES planned to do with his J Frame .38 caliber revolver. TOUTGES responded, "they [Gaylord members] know I got that." The CI asked TOUTGES, "Why do you let those guys know your business?" TOUTGES stated, "listen those who seen it [the revolver] and everyone who was around that computer seen that gun, they know that's my personal gun." Referring to himself in the third person, TOUTGES stated, "Serg always keeps a gun."

22

b.   The CI stated, "If you ever want to come off [sell] that J Frame, I'll still take it." TOUTGES responded, "no that's my personal . . . that's my personal [gun]." The CI stated, "I'll throw $550, I won't go no higher." TOUTGES responded, "I got it back from Individual C, straightened it [cleaned/repaired the gun] out and that's mine . . . that's mine." The CI told TOUTGES, "I don't want you to forget my offer [to buy the revolver] is out there at all times." The CI explained, "I love J Frames, I'll take it, it's not an Air Weight [referring to a brand of .38 caliber revolver] but I'll take it."

**February 16-19: MILLHORN Agreed to Sell TOUTGES's .38 Caliber Revolver to the CI to Raise Bond Money After TOUTGES's Arrest (Count Three)**

28.   According to Villa Park Police reports, on or about February 16, 2011, Villa Park Police and other law enforcement agents executed a search warrant at the Beach Street residence. TOUTGES was subsequently arrested and charged with possession of cannabis and possession of a controlled substance. TOUTGES was detained in DuPage County Jail in lieu of bond.

29.   According to the CI, on February 16, 2011, after the execution of the search warrant, the CI and another Gaylord, Individual D, went to the Beach Street residence. At the time, the CI wore a disguised audio recording device

23

that he had previously been given by ATF agents. According to the CI, the CI and Individual D went to the Beach Street residence in order to measure the door, which had been damaged when police executed the search warrant. As reflected on the audio recording, the CI and Individual D spoke with MILLHORN while at the Beach Street residence. MILLHORN stated that the police officers who searched the Beach Street residence had not found TOUTGES's gun. MILLHORN stated that TOUTGES had told her to look for the revolver in the laundry room. According to the CI, MILLHORN and Individual D searched the laundry room, but were unable to find the revolver. The CI told MILLHORN that if or when she found the gun, he would buy the gun for $1,000. The CI stated that the gun was not worth $1,000 but that the CI would lend her $1,000 for use towards TOUTGES's bond, and hold the gun as collateral until MILLHORN and TOUTGES repaid the loan.

30. On or about February 17, 2011, at approximately 1:37 p.m., the CI received a telephone call from MILLHORN. Due to the unexpected nature of the phone call, the CI was not able to record the beginning of the conversation. As reflected in the audio recording, MILLHORN stated that her mom had agreed to loan her money for TOUTGES's bond. The CI stated, "I got a ride for like, the next thirty minutes, um . . . if you want to do that [sell the .38 caliber revolver for $1,000]." MILLHORN stated that she had to pick up her mother from work.

24

The CI stated, "And we would be able to do this at your place or my place? What would you prefer?" MILLHORN replied, "I don't know yet. I got to see if I can take the van when my mom gets off work."

31.     On or about February 18, 2011, MILLHORN had a recorded jail telephone conversation with TOUTGES, who was in custody in the DuPage County Jail. During this call, MILLHORN told TOUTGES that she was getting the bond money from the CI. MILLHORN also assured TOUTGES that "James [GRACE] is handling it [the sale of the revolver]."

32.     On or about February 19, 2011, at approximately 2:30 p.m., the CI contacted an ATF agent and told the agents that s/he would be going to a surprise birthday party at Individual D's house in Villa Park. The ATF agent instructed the CI to turn on the recording device and record the conversations at the party.

33.     As reflected in the audio recording, during the party, GRACE stated that he would be delivering TOUTGES's revolver to the CI for MILLHORN. GRACE stated, "she [MILLHORN] does not want it [the revolver] in her possession." The CI stated, "ok, bring you're A game [be ready for the transaction]." The CI stated that he had spoken to MILLHORN earlier and that MILLHORN had explained that she had located the .38 revolver and that she would sell the gun to the CI for $1,000. The CI told GRACE that MILLHORN

25

said that she would use the money to bond TOUTGES out of jail. GRACE stated, "She's [MILLHORN] giving it [the .38 caliber handgun] to me tomorrow and giving it [the .38 caliber handgun] to you." GRACE also stated, "She's [MILLHORN] nervous and she [MILLHORN] says 'I'm [MILLHORN] scared of everybody,' and she [MILLHORN] don't wanna answer any questions or talk to anybody." According to the CI, MILLHORN had raised $14,000 for TOUTGES's bond and the CI's $1,000 would be the last amount needed to bond TOUTGES out of jail.

## February 20: KRUZEL Delivered TOUTGES's .38 caliber Revolver to the CI for MILLHORN (Count Three)

34.    On or about February 20, 2011, law enforcement met with the CI to prepare the CI to buy a revolver from MILLHORN. Before the transaction, an ATF agent searched the CI for contraband, with negative results. An ATF agent gave the CI $1,000 in pre-recorded ATF funds to be used to buy the revolver. The agent also outfitted the CI with a disguised audio/video recording device and activated the audio/video recording device.

35.    At approximately 12:15 p.m., surveillance was established in the area of a hotel in Lombard, Illinois. As reflected in the audio/video recording, the CI made a series of phone calls to MILLHORN, GRACE, and KRUZEL.

26

During these telephone calls,[16] the CI learned that KRUZEL and not GRACE would be delivering the revolver to the CI. Additionally, the CI was told to give the money to KRUZEL.

36. At approximately 1:10 p.m., an undercover ATF agent entered the lobby of the hotel to conduct surveillance. At approximately 1:15 p.m., the undercover ATF agent walked out of the lobby and saw KRUZEL[17] walk through the hotel parking lot and enter the lobby. The undercover ATF agent also saw a dark colored Ford Bronco bearing temporary Illinois license plate number 561M052[18]. The Ford Bronco was parked in the south portion of the of the hotel parking lot.

37. As reflected in the audio/video recording, KRUZEL entered the CI's apartment and handed the CI a dark-colored cloth bag. The CI emptied the contents of the bag onto the kitchen counter and several shells can be seen

---

[16]   Only the CI's side of the call can be heard on the recording device.

[17]   The identification of KRUZEL and KRUZEL's voice in this affidavit is based on the following: First, on or about February 4, 2011, the CI reviewed various photographs and identified a photograph depicting KRUZEL. Second, on or about February 20, 2011, the CI met with KRUZEL and the meeting was audio and video recorded. Third, an ATF agent positively identified KRUZEL from the audio/video recording based on the photograph from February 4, 2011, which the CI previously identified. Fourth, based on the ATF agent's review of the audio/video recording from the February 20, 2011 meeting, that agent was able to identify KRUZEL's voice.

[18]   According to Illinois Secretary of State records, temporary license plate 561M052 was registered to a 1991 Ford Bronco belonging to Joseph R. Kruzel at the KRUZEL residence.

falling onto the counter. According to the CI, a .38 caliber revolver also fell out of the bag and the CI handed KRUZEL $1,000. As reflected in the audio/video recording, the CI stated, "we're all good, brother." KRUZEL then left the CI's apartment.

38.     At approximately 1:25 p.m., surveillance agents saw KRUZEL walk out of the hotel to the Ford Bronco, enter the Ford Bronco, and drive out of the parking lot. Law enforcement then met with the CI and retrieved a .38 caliber Smith and Wesson revolver, bearing serial number J906578, one HKS brand 5 capacity speed loader, 12 live Winchester-Western brand rounds of .38 caliber ammunition, a blue colored Crown Royal cloth bag and the audio and video recording devices. The CI identified the .38 caliber Smith and Wesson revolver as the revolver that the CI saw TOUTGES possess at TOUTGES's and MILLHORN's residence in Villa Park on January 15, 2011 (see paragraph 21(b)). According to the CI, the HKS brand 5 capacity speed loader and the ammunition were the same type that the CI had seen at TOUTGES's and MILLHORN's residence on January 15, 2011.

39.     On or about February 20, 2011, MILLHORN had a recorded telephone conversation with TOUTGES, who was in custody in the DuPage County Jail. MILLHORN told TOUTGES that other family and friends were with her now waiting for him [TOUTGES] to get out of jail. MILLHORN told

TOUTGES that the CI had underestimated her. MILLHORN also told TOUTGES that she and a friend had put it all together [come up with bond money by, among other things, selling the .38 caliber revolver to the CI].

40.     On or about March 19, 2011, after TOUTGES was released from DuPage County Jail on bond, the CI met with TOUTGES. Before the meeting ATF agents met with the CI and an ATF agent searched the CI for money and contraband, with negative results. An ATF agent then gave the CI an audio recording device to record his conversations with TOUTGES and other Gaylord street gang members. As reflected in the audio recording, the CI asked why TOUTGES had not trusted the CI when the CI bought TOUTGES's revolver. TOUTGES replied, "No, who fucking said that?" The CI stated, "Cause that day with the .38, she [MILLHORN] sent Joe [KRUZEL] instead of coming with it herself." TOUTGES said, "Cause she was freaking out, she was like fucking . . . then she was like 'I'm only trusting James [GRACE] and Joe [KRUZEL].' I said do whatever you gotta do, raise the fucking money . . . she grew up with them two [GRACE and KRUZEL]. They're from Addison." After the meeting, the CI met with ATF agents, who searched the CI for money and contraband, with negative results. The agents retrieved the audio recording device from the CI.

29

41.     On July 28, 2011, an ATF agent concluded that the Smith & Wesson, model 49, .38 caliber revolver, bearing serial number J906578 was not manufactured in the state of Illinois.

**February 26: The CI Paid GRACE $400 for the .25 Caliber "Nation" Gun that KRUZEL had Given the CI on February 19**

42.     On February 19, 2011, GRACE and KRUZEL gave the CI a Gaylord "nation" gun. According to the CI, prior to leaving a party the CI was attending, GRACE stated that KRUZEL was going to deliver something to the CI that night for "the nation." According to the CI, KRUZEL and the CI later met in a back bedroom, and KRUZEL gave the CI a small cloth bag, which the CI tried to refuse. KRUZEL told the CI to hold it until it was needed at a later time. This conversation was not recorded.   Shortly thereafter, the CI met with an ATF agent and APD officer in a remote location and gave them the black Crown Royal-brand cloth bag containing a Pretoria Arms Factory, .25 caliber pistol, bearing serial number A7037, loaded with 7 rounds of ammunition, a magazine, a rubber band/grip, a black colored Crown Royal-brand cloth bag.

43.     On February 20, 2011, at approximately 12:35 p.m., the CI placed a consensually–recorded telephone call to GRACE. The CI stated, "this week, I was going to make you an offer you can't refuse. I was going to give you my end [referring to the CI's portion of the profit from the sale of controlled

substances][19] in exchange for this beautiful baseball card [gun] Joe [KRUZEL] has got me holding on to." GRACE responded, "I will talk to you when I see you."

44. On February 26, 2011, the CI attended a party at a residence in Lombard, Illinois. Prior to party, an ATF agent searched the CI for contraband, with negative results, and provided the CI with $700 in ATF funds—$400 to pay GRACE for the .25 caliber handgun that KRUZEL had given the CI to hold on behalf of the gang on February 19[20]. The agent also equipped the CI with a disguised audio recording device and activated the device.

45. At approximately 3:55 p.m., the CI left the staging area and traveled to the KRUZEL residence. Agents maintained a loose surveillance of the area around the residence, but did not observe the CI enter the residence.

46. As reflected in the audio device recording:

a. The CI told GRACE, "I got an offer for you. That's a nice little .25 [caliber handgun that KRUZEL gave the CI on February 19, 2011]."

---

[19] During the investigation, GRACE approached the CI and asked if the CI could obtain illegally obtained prescription medicine for sale on the street. The CI informed ATF of GRACE's request. At the direction of ATF agents, the CI offered to obtain and sell the prescription medicine for GRACE if GRACE would front him money each week. The CI stated that s/he would then split the resulting profit with GRACE. GRACE agreed. In reality, the CI did not obtain or sell any prescription medicine, and the resulting "profits" he later paid to GRACE were actually ATF funds.

[20] The remaining money constituted GRACE's portion from the sale of prescription medicine as described in footnote 18.

GRACE replied, "yeah, but that's not mine to give. That's the neighborhood's [Gaylord's]. I can't just give it . . ." The CI explained, "alright. I just, I don't have a .25 anymore so . . . that's why I was going to . . ."

b.   Shortly thereafter, the CI asked, "so I'll just hold on . . . [to the .25 caliber gun given to the CI on February 19, 2011] for when it's call upon?" GRACE replied, "yeah, you know, if you could get it back to Joe [KRUZEL] within the next couple of weeks, it's fine." GRACE stated, "because he's [KRUZEL's] got a [FOID] card, you know. . . . that way it's legal."

c.   As reflected in the audio recording, the CI later spoke with KRUZEL about the .25 caliber handgun that KRUZEL had given the CI to hold. The CI stated, "James [GRACE] asked me to ask you when you want that .25 back?" KRUZEL stated, "no time soon that I know of." KRUZEL explained, "I have enough [guns] in my house as it is."

47.   On July 28, 2011, an ATF agent concluded that the Pretoria Arms Factory, .25 caliber pistol, bearing serial number A7037 was not manufactured within the state of Illinois.

32

## June 11: PRICE Sold a .40 caliber Handgun to the CI (Count Four)

48. On May 27, 2011, at approximately 10:44 a.m., the CI received a consensually–recorded telephone call from PRICE.[21] PRICE stated, "I guess I'm trying to sell my fucking gun . . . they are going to turn my electric off if I don't have $200 by today." The CI asked, "what are you looking for it?" PRICE stated, "I really don't want to get rid of it, it's my .40 [caliber handgun], but I have no fucking choice, I have to get on the internet and see what it's worth, it's a Smith & Wesson .40 caliber." The CI asked, "are you willing to sell it?" PRICE stated, "well I have no fucking choice, it's either that or my Harley, and I ain't getting rid of my Harley." PRICE stated, "I know it's got to be worth at least 350, 400." The CI asked, "this ain't in your name, though, right?" PRICE stated, "no, it can't be traced to me." The CI told PRICE to call him back with a price.

49. At approximately 11:51 a.m., the CI placed a consensually–recorded telephone call to PRICE. PRICE stated, "I talked to a buddy of mine, he said it's

---

[21] The identification of PRICE in this affidavit is based upon the following: First, on or about March 31, 2011, ATF agents showed the CI an Illinois Driver's License photograph of PRICE and the CI stated that the person depicted in the photograph was the person that he knew as "Bear." Second, on or about April 29, 2011, the CI met with PRICE in a car and the meeting was audio recorded. The CI and PRICE were the only two individuals in the car and participating in this meeting. An ATF agent, who knew the voice of the CI, positively identified PRICE's voice in the audio recording. Third, an ATF agent, who knew and had seen the CI, conducted surveillance of the April 29, 2011 meeting between the CI and PRICE. The ATF agent identified PRICE based on the photograph that the CI had previously identified on March 31, 2011, as depicting PRICE.

worth 450 [$450], and that's just with the one clip, I got two clips and a box of shells." PRICE stated, "I'm trying to borrow the money from a friend so I don't have to get rid of it."

50.     On or about June 10, 2011, at approximately 1:34 p.m., the CI received a consensually–recorded telephone call from GRACE. As reflected in the audio recording, GRACE stated, "I'm sitting here with Bear [PRICE], and he said what you talked about he'll [PRICE] do." PRICE can be heard in the background saying, "450." Grace then told the CI, "450." The CI stated, "alright, when?" GRACE responded, "Whenever you want . . ." PRICE can be heard in the background stating "today." GRACE then stated, "today would be good." GRACE stated, "do you want it?" The CI stated, "yeah, tell him yes." The CI stated, "ask him [Price] if five o'clock's is good for him." GRACE responded, "it's good for him, but it sucks for me because I got to be home at 5:00." GRACE then stated, "you'll meet at my house."

51.     At approximately 1:57 pm, the CI received a consensually–recorded telephone call from PRICE. During the call, PRICE asked the CI, "what's up brother, you coming by . . . are you coming by the house or not?" The CI stated, "okay, you want me to meet you by your house by 5:00?" PRICE responded, "no, we're going by James's [the GRACE residence]. . . if you can do it, we'll deal with it that way." The CI stated that s/he would try to get a ride.

52.    At approximately 2:00 p.m., the CI placed a consensually—recorded telephone call to GRACE. The CI asked where GRACE and PRICE were. GRACE stated, "no, we're pulling into my driveway right now." The CI stated, "I could come pick it up . . ." GRACE then handed the telephone to PRICE. The CI stated that s/he could get to GRACE's house in the next 45 minutes or hour. PRICE stated, "I don't have it with me." PRICE continued, "I'm doing this to make my son have a good graduation party. I'm giving up my last piece [firearm] of my older brother." PRICE stated, "just fucking come over here and we'll deal with it."

53.    ATF agents then met with the CI to prepare him for his meeting with PRICE and GRACE. Prior to the meeting, an agent searched the CI for contraband, with negative results. Agents then outfitted the CI with a disguised audio/video recording device. Agents also gave the CI $500 in ATF funds to buy the gun from PRICE.

54.    At approximately 3:40 p.m., an undercover agent (the "UC agent") drove the CI in an undercover vehicle ("UCV") to the GRACE Residence. After stopping the vehicle, the UC agent observed the CI get out of the vehicle, and enter the GRACE Residence. The UC agent stayed outside in the UCV and waited for the CI to return.

35

55.     According to the CI, after the CI entered the residence, he spoke with GRACE, PRICE, and another Gaylord, Individual E. As reflected in the audio/video recording, PRICE told the CI, "I'm not happy with what I am doing . . . we need to talk." When the CI told PRICE that the UC agent was outside waiting, PRICE responded, "I don't give a fuck who he is, I don't like strangers in my world." PRICE stated that he did not know the UC agent and did not feel comfortable having a stranger present when he sold the gun to the CI. PRICE said, "Stranger. I don't think so." As reflected in the audio/video recording, GRACE and Individual E told the CI to invite the UC agent in for a beer.

56.     As reflected in the audio/video recording, PRICE asked Individual E needed to drive PRICE to his [PRICE's] house to pick up the gun. PRICE stated, "I'm selling the gun to fucking him, it's my brother's last gun[22] I owned. . . .the gun is at my house and you [Individual E] need to take me there to get it." Individual E agreed to take PRICE to PRICE's house. PRICE told the CI, "This is my life brother." The CI replied, "Mine too, I'm a convicted felon, on parole and I still got a week to go." PRICE stated, "Well I don't have a fucking felony" and "this is everything I own. . . . I could throw my family in the toilet."

57.     At approximately 3:50 p.m., the UC agent observed the CI come out of the residence and return to the UCV. The CI told the UC agent that GRACE

---

[22]     According to the CI, the handgun used to belong to PRICE's deceased brother.

36

and another Gaylord, Individual E, were in the house and wanted the UC agent to come inside the house and have a beer. The CI also told the UC agent that PRICE, however, did not want to sell the CI the handgun while the UC agent was waiting outside because PRICE did not know the UC agent. The UC agent decided to leave the area and the CI returned to the residence.

58.     At approximately 5:38 p.m., the CI placed a consensually–recorded telephone call to PRICE. The CI stated, "hey Bear, what's up?" PRICE responded, " Let's fucking redo this thing man [meet to complete the gun sale]. I'm at home now and trying to get into the house. I just didn't know your friend [the UC agent] and I can't get in my house right now, I'm still trying to pick my lock." PRICE stated, "so if you want to do this, dude, we got it covered but me and Junior are here now." PRICE told the CI, "I'll get a hold of you soon." When the CI asked when, PRICE responded, "today."

59.     At approximately 7:00 p.m., the CI received a consensually–recorded call from GRACE. GRACE stated, "I'm sorry about earlier, man." The CI stated, "it was out of your control. He called me back talking about he was sorry and he was going to come out to my house tonight." GRACE stated, "he don't like other people . . . but I said to him, let me handle things, and I'll be the middle man, and you won't have to worry about it." GRACE and the CI discussed how PRICE had disrespected the CI. GRACE stated, "I was getting aggravated . . . there's

37

no reason to be all goddamned fucking paranoid towards your brother [fellow Gaylord]. But he's going to come out to your [the CI's] crib today, and that will be good."

60.    On June 11, 2011, at approximately 5:30 p.m., the CI placed a consensually–recorded telephone call to GRACE. The CI stated, "Bear [PRICE] never showed up last night, just to let you know . . . and never called me today, so I didn't call him. If I don't hear from him by tomorrow, I'm going back to the bank and putting [the money for the firearm] back in the ATM."

61.    At    approximately    6:30    p.m.,    the    CI    received    a consensually–recorded phone call from KRUZEL. During the call, KRUZEL stated, "I'm going to head up and go right now, and I'll come swoop you up myself, and I figure what we'll do since I already talked to him [PRICE], we'll stop at Gene and Judes [restaurant], grab some hot dogs, stop at Bear's, talk to him and . . . whatever." The CI asked, "Bear [PRICE] wants to see me?" KRUZEL stated, "yeah, he said, 'I wanted to see him [the CI] anyway' . . . he [PRICE] said, 'there was something I wanted to do with him.'"

62.    The CI then notified ATF agents that KRUZEL was going to pick the CI up and that the CI was going to stay the night at the KRUZEL residence. The CI also stated that PRICE was willing to sell him the .40 caliber handgun

38

from the previous day. ATF agents instructed the CI to record the conversations with the disguised audio recording device that agents had given the CI.

63.     According to the CI, on June 11, 2011, KRUZEL picked him up and drove to PRICE's residence in Elmhurst, Illinois. As reflected in the audio recording:

a.      After the CI and KRUZEL entered the residence, PRICE asked, "Are you ready for this?" PRICE continued, "I got it [the .40 caliber handgun] for you man, it's all good." PRICE stated, "Joe [KRUZEL], you're going to clean every inch of it [referring to wiping the gun to remove any fingerprints]." PRICE then stated, "You're not leaving here with ammo . . . you get ammo fucking tomorrow or something 'cause I'm not fucking putting them both [the gun and ammunition] together."

b.      PRICE then stated, "Joe [KRUZEL], you're leaving here with something else." KRUZEL replied, "yeah." According to the CI, PRICE gave KRUZEL a .22 caliber bolt action rifle. As reflected in the audio recording, PRICE then warned the CI, "if I lose my fucking world dude [get arrested for unlawful gun sale] I'm gonna attack you like a pack of wolves cause I'm doing it for my son, my son graduates tomorrow." PRICE continued, "This is my fucking

39

world if this bites me in the ass man, I'm done, my whole fucking world is done." The CI replied, "Mine too." PRICE responded, "I know, you told me already, I already got a card [referring to an FOID card] I gotta a card dude" and "I'm just being cautious, it's my family man, it's my fucking world." The CI stated, "I understand brother" and "God forbid, if something happens I got it off a fucking Chinaman [bought the gun from someone else]." PRICE stated, "it's traced to a dead man [PRICE's brother who died and left PRICE the gun], the guy is fucking dead for 2 years now."

c. As reflected in the audio recording, the CI later asked, "So I gotta come back for ammo you're saying?" PRICE replied, "Uh no, I'll bring that to you but you're not getting anything . . . I'll give you 1 bullet." PRICE continued, "I'll leave you one [bullet] in case you need it [need to shoot the firearm] but you got 2 clips, a .40 Smith and it's all clean with papers, it's got the instruction manual, everything." PRICE added, "I gotta find the key [referring to the key for the gun lock] but you got a gun lock but yeah, 2 clips this is high volume you get 10 fucking rounds each, they don't make these anymore, this is a more expensive gun but you got 2 clips, the extra

clip is $25, $30." PRICE stated, "I got a box of 50. You get 1 shell tonight and I'll give you the fucking 49, 50 tomorrow or Monday."

d.    PRICE told the CI, "Why don't you give me some cash so I can send her away so I really don't want her to be here." According to the CI, PRICE was referring to his wife, who was present. As reflected in the audio recording, the CI agreed and counted out the $450 and gave the money to PRICE. PRICE told the CI, "and you're going to wipe this down [for fingerprints] before you leave and the shells are staying, I'll leave you with just one." According to the CI, PRICE then gave KRUZEL a .22 caliber bolt action rifle.

e.    As reflected in the audio recording, PRICE learned that the CI was staying at KRUZEL's house that night. PRICE stated, "oh that's good cause he's legal [referring to KRUZEL having a valid FOID card]. Me and him are the only legal ones in the whole fucking Nation [PRICE and KRUZEL are the only Gaylords legally able to own guns]." PRICE later stated, "I just thought about something Joe, Joe [KRUZEL], I just thought about something. I'm writing you a receipt before you leave this house. . . . I'm writing a receipt with my FOID card to your FOID card to that serial number that you left this house with this gun [that PRICE had sold to the CI] .

41

. . cause then it makes it legal." In order to disguise the illegal firearms transaction to the CI, a convicted felon and prohibited from possessing a firearm, PRICE decided to fill out paperwork that he legally transferred the gun to KRUZEL, who is not a convicted felon. PRICE advised KRUZEL, "I'm going to write a receipt that it [the handgun that PRICE sold to the CI] left from me to you, I sold it to you for $300." After KRUZEL agreed, PRICE continued, "and then we'll put my FOID card your FOID card serial number and then if there's any questions they can come and talk to me and say yes I sold it to my brother, we're both legal . . . whether you're with him or not that's not their fucking job." The CI stated, "they [the police] don't know that you know that I've been to the joint [prison] since the 90's you know what I mean." The CI added, "dude, I'll be off of parole in 5 days."

f.       According to the CI, PRICE and KRUZEL then drafted a receipt for the sale of the gun. As reflected in the audio recording, PRICE stated, "alright give me the fucking serial number off that thing it should be on the side." PRICE then stated, "I, B. PRICE, sell to . . . full name, dude, on your card." KRUZEL responded "Joseph Robert, uh, Joseph R. KRUZEL." At this point during the conversation,

42

PRICE wrote KRUZEL's full name on the receipt for the sale of the handgun. KRUZEL stated, "one SW40G, that's the model number." PRICE asked, "uh, you got the serial number." KRUZEL replied, "yep, PAW8935 for the sum of $300 paid in full." PRICE stated, "come here and sign this [receipt] and write one to me." KRUZEL asked, "Why do I have to write one for?" PRICE stated, "because we both have to have one [a receipt] . . . fucking deal with it."

64. On June 12, 2011, at approximately 10:22 a.m., the CI placed a consensually–recorded telephone call to GRACE. During the call, the CI stated, "me and Bear [PRICE] took care of that, that .40 [caliber handgun]." GRACE responded, "okay."

65. On June 12, 2011, ATF agents met with the CI to debrief the CI regarding his meeting with PRICE on June 11, 2011. Agents retrieved the audio recording device from the CI. Agents also retrieved a Smith and Wesson .40 caliber model SW40V handgun, bearing serial number #PAW8935, a blue plastic gun box, an instruction manual, a gun lock, two magazines for the handgun and one bullet for the handgun.

66. On July 28, 2011, an ATF agent concluded that the Smith & Wesson, model SW40V, .40 caliber handgun, bearing serial number PAW8935 was not manufactured within the state of Illinois.

43

**June 23: PRICE Delivered 50 Rounds of .40 Caliber Ammo to the CI**

67.    On June 23, 2011, PRICE delivered the CI a 50-round box of .40 caliber ammunition to the CI. On June 23, 2011, the CI met with GRACE at the GRACE Residence in Addison. Prior to the meeting, ATF agents outfitted the CI with a disguised audio recording device. As reflected in the audio recording, during their conversation, GRACE made a telephone call. After hanging up the phone, GRACE told the CI that "he [PRICE] wants to take it [the ammunition] right over to your house on the bike [PRICE's motorcycle] cause if it's not raining . . . over there today on the bike."

68.    The CI later met with ATF agents at the CI's residence. Agents search the CI and the CI's residence for contraband, with negative results. Agents then provided the CI with a disguised audio recording device and instructed the CI to turn the recording device on when PRICE arrived.

69.    At approximately 6:00 p.m., surveillance saw PRICE arrive at the CI's residence on a motorcycle. Agents saw PRICE park the motorcycle in front of the CI's apartment and enter the apartment.

70.    As reflected in the audio recording, after PRICE entered the CI's residence, the CI asked why PRICE only gave him [the CI] one bullet the night that PRICE sold the CI the handgun. PRICE responded, "Just in case you needed it for emergency, yeah." The CI asked if it would look bad if KRUZEL

had ammunition with him. PRICE replied, "Yeah, if he would've had a whole box. Man if he had one shell, they fucking, you know, I doubt they would say anything . . . instead of 50 fucking rounds with ya." According to the CI, PRICE handed him a 50-round box of Smith & Wesson .40 caliber ammunition. As reflected in the audio recording, the CI thanked PRICE. The CI also told PRICE that his parole had terminated but that the CI was still a convicted felon.

71.    At approximately 6:35 p.m., surveillance saw PRICE leave the CI's residence. The CI subsequently called an ATF agent, reported that PRICE had left. Agents returned to the CI's residence and retrieved the audio recording device and one box of .40 caliber Smith and Wesson Law Man Brand ammunition. Upon closer inspection, agents saw that one bullet from the box of 50 rounds was missing.

## June 27: KRUZEL Sold the CI a Box of .22 Caliber Ammunition (Count Five)

72.    In June 2011, KRUZEL agreed to sell the CI a box of .22 caliber ammunition.[23]

---

[23]    During a recorded conversation on April 29, 2011, KRUZEL admitted to knowing that the CI was a convicted felon. Prior to the conversation, ATF agents outfitted with a disguised audio recording device. As reflected in the audio recording, the CI told KRUZEL, "so you know, I've been doing time for the Nation [Gaylords] since the 90's." KRUZEL responded, "yeah." The CI stated, "oh, you did know that."

73. On June 24, 2011, at approximately 10:32 a.m., the CI placed a consensually–recorded telephone call to KRUZEL. During the call, the CI stated, "I finally got those fucking tickets from Bear [PRICE], for that concert [ammunition], the 40 concert [.40 caliber ammunition], you know." KRUZEL stated, "okay." The CI stated, "I was wondering if you could go to Walmart for me and get me the tickets for that long concert, the 22 tickets [.22 caliber ammunition]." KRUZEL stated, "yeah, not a problem." The CI asked when s/he could stop by. KRUZEL stated, "you can come over tonight if you want, I already got 'em." KRUZEL stated that the CI could stop by the KRUZEL residence "anytime after 6:00."

74. On June 27, 2011, at approximately 5:24 p.m., the CI placed a consensually–recorded telephone call to KRUZEL. The CI asked if KRUZEL was home. When KRUZEL replied that he was, the CI stated, "I'll be there in a few."

75. On June 27, 2011, the CI met KRUZEL at the KRUZEL residence and purchased a box of 41 assorted rounds of .22 caliber ammunition. Prior to the meeting, at approximately 5:30 p.m., ATF agents met with the CI and searched the CI for money and contraband, with negative results. The agents gave the CI $100 in pre-recorded ATF funds for use in purchasing the ammunition. The CI then made a consensually–recorded telephone call to KRUZEL and informed KRUZEL that the CI was en route to KRUZEL's house.

46

76.     An undercover ATF agent drove the CI to KRUZEL's house in Lombard. Prior to arriving at the house, the undercover ATF agent outfitted the CI with a disguised audio recording device and activated the recording device. At approximately 5:55 p.m, the undercover agent parked in front of KRUZEL's house, and observed the CI got out of the car and enter the residence.

77.     As reflected in the audio recording:

a.      KRUZEL asked the CI, "now that we're face-to-face, what exactly did you need [what caliber and type of ammunition did the CI want to buy]?" The CI responded, ".22 long." KRUZEL stated, "Shit, I was right the first time." The CI stated, "oh well, it's no big deal but I assumed that I was understood . . . communication." According to the recording, KRUZEL stated, "I kind of guessed it but then after awhile I was like I might have misunderstood what you were saying." The CI stated, "I was trying to stay long [referring to .22 caliber long ammunition] on the show . . . 'cause I try to be careful what I'm saying on the phone you know."

b.      According to the CI, KRUZEL took the CI into his bedroom and KRUZEL retrieved a Sentry Lock Box from a dresser. The CI stated that KRUZEL used a key to open the lock box. According to the CI, the CI saw that the box was filled with ammunition. KRUZEL

47

stated, "you know me and Bear [PRICE] we can have any conversation we need [referring to not needing to talk in code over the telephone about guns or ammunition]."

c.  The CI stated, "but ok how many [ammunition in the box] are in there?" According to the CI, while looking inside the lock box, KRUZEL took out a box of .22 long ammunition and gave it to the CI. As reflected in the audio recording, KRUZEL stated, "there's a couple of short's [referring to a regular version of the .22 caliber ammunition] in there. . . I wonder what those were for . . . I don't care you can have them too." The CI asked, "thank you and what do you want for that [referring to the price of the ammunition]?" KRUZEL responded, "this [ammunition] is the Nation's [Gaylord's] man we've had this since fucking . . . ." The CI stated, "what do you want for it [the ammunition], Joe?" KRUZEL stated, "what 10 bucks or something or something I'll just throw it in the fucking . . . ." The CI stated, "here take $20 take $20 and because I'll need you in the future for .410's or something .38's whatever [other types of ammunition]. . . ."

d.  KRUZEL later stated, "I remember I had them [ammunition] from the one derringer we [the Gaylords] had, it took .22 longs and so we

48

had." At the conclusion of the sale, the CI told KRUZEL, "I got a ride waiting on me so." KRUZEL responded, "alright bro." The CI stated, "I don't want to take a chance driving." KRUZEL offered to sell ammunition for the CI's AK-47 but the CI told KRUZEL that he [the CI] had plenty of ammunition for his AK-47.

78. At approximately 6:02 p.m., the undercover ATF agent observed the CI walk out of KRUZEL's house and enter the ATF undercover vehicle. The CI then handed the agent a clear plastic box containing .22 caliber long round ammunition and .22 short round ammunition to the undercover ATF agent. The undercover ATF agent turned the audio recording device off and drove the CI to a remote location to be debriefed. During the subsequent the debriefing, an ATF agent searched the CI for money, weapons, narcotics, and other contraband, with negative results.

79. On August 19, 2011, an ATF agent concluded that the .22 caliber "long" ammunition and the .22 "short" ammunition was not manufactured within the state of Illinois.

49

## CONCLUSION

80.    Based on the foregoing, I believe there is probable cause to believe that on or about January 12, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JAMES GRACE, also known as ("aka") "Mega," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm, namely, an Amadeo Rossi .38 caliber handgun, bearing serial number 157156, which firearm was in or affecting interstate commerce in that the firearm had traveled interstate prior to the defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count One);

81.    Based on the foregoing, I believe there is probable cause to believe that o n or about January 15, 2011, at Villa Park, in the Northern District of Illinois, Eastern Division, SERGIO TOUTGES, aka "Little Rat," having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm, namely, a .38 caliber Smith and Wesson revolver, bearing serial number J906578, which firearm was in or affecting interstate commerce in that the firearm had traveled interstate prior to defendant's possession of the firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Two);

82.    Based on the foregoing, I believe there is probable cause to believe

50

that on or about February 20, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JENNIFER MILLHORN, JAMES GRACE, aka "MEGA," and JOSEPH KRUZEL did knowingly sell in and affecting interstate commerce a firearm, namely, a .38 caliber Smith and Wesson revolver, bearing serial number J906578, which firearm had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2 (Count Three);

83.     Based on the foregoing, I believe there is probable cause to believe that on or about June 11, 2011, at Elmhurst, in the Northern District of Illinois, Eastern Division, BOBBY PRICE, aka "Bear," and JOSEPH KRUZEL, did knowingly sell in and affecting interstate commerce a firearm, namely, a Smith and Wesson, .40 caliber handgun, Model SW40V, bearing serial number #PAW8935, which firearm had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2 (Count Four)

51

84.     Based on the foregoing, I believe there is probable cause to believe that on or about June 27, 2011, at Lombard, in the Northern District of Illinois, Eastern Division, JOSEPH KRUZEL, did knowingly sell in and affecting interstate commerce ammunition, namely, forty-one .22 caliber long round ammunition and .22 caliber short rounds, which ammunition had traveled interstate commerce, to a person knowing or having reasonable cause to believe that such person had been convicted of a crime punishable by imprisonment for a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 2 (Count Five).

FURTHER AFFIANT SAYETH NOT.

LARISSA K. BACCUS
Special Agent, Bureau of Alcohol,
Tobacco, Firearms, & Explosives

Subscribed and sworn before me on August 22, 2011.

MARIA VALDEZ
United States Magistrate Judge